NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports.  Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Cheshire
No. 2017-0512

THE STATE OF NEW HAMPSHIRE

v.

JASON WILBUR

Argued:  June 14, 2018
Opinion Issued:  October 25, 2018

Gordon J. MacDonald, attorney general (Elizabeth A. Lahey, assistant attorney general, on the brief and orally), for the State.

David M. Rothstein, deputy director public defender, of Concord, on the brief and orally, for the defendant.

LYNN, C.J.  The defendant, Jason Wilbur, appeals a decision of the Superior Court (Ruoff, J.) denying his motion for a new trial based on ineffective assistance of counsel.  We reverse and remand.

I. Background

We briefly summarize the evidence that was presented to the jury, reserving for later a more detailed discussion of the specific evidence and arguments that form the bases of the issues raised in the defendant's appeal. The defendant is the former stepfather of the alleged victim (child) in the case.

The child was born in 1997, and was five or six years old when the events discussed herein allegedly occurred.  The child's mother met the defendant in 2002 and the couple married in 2003.  The mother and the defendant had a "love/hate relationship."  As a result of their tumultuous relationship, at times the couple resided together, while at other times the mother lived with the child's father.  Throughout this time, the father had primary custody of the child, and the mother had visitation privileges every other weekend.

In 2007, the child disclosed that she had been sexually assaulted by the defendant.  The defendant was subsequently indicted on charges of aggravated felonious sexual assault (AFSA), but the State nol prossed the charges in April 2009.  In 2010, the defendant was re-indicted on: (1) one count of AFSA alleging a single act of digital penetration; (2) one count of AFSA alleging a pattern of digital penetration; (3) one count of AFSA alleging a single act of penile penetration; and (4) one count of AFSA alleging a pattern of penile penetration.  See RSA 632-A:2, I(l) (2016); RSA 632-A:2, III (2016).

At trial, the child testified that the defendant began sexually assaulting her while she was alone with him at his apartment in Jaffrey.  She explained that the first incident occurred after the defendant followed her into the bathroom and asked if she wanted to play a game.  When the child replied "yes," the defendant rubbed his finger "around [her] private area" (which she later clarified to mean her vagina).  The assault ended when the mother returned to the apartment.

The child stated that the defendant subsequently assaulted her in the same manner "multiple times," explaining that the assaults occurred "practically . . . every time [she] came over."  According to the child, the assaults escalated to digital penetration of her vagina and then to penile penetration of her vagina.  As to the penile penetration, the child indicated that she did not see the defendant insert his penis into her vagina because the defendant covered her eyes.  She noted, however, that "it was different" from the instances where the defendant inserted his finger because it felt "weird and warm."  The child further explained that the assaults continued after the defendant and the mother moved to Swanzey.  She testified that the defendant would sometimes wake her at night, ask her if she wanted to "play a game," and then sexually assault her.

In May 2011, a jury found the defendant guilty on the two counts of AFSA alleging digital penetration, and acquitted the defendant on the two counts of penile penetration.  We affirmed the defendant's convictions on direct appeal.  See State v. Wilbur, No. 2011-0627 (N.H. Dec. 14, 2012).  In June 2014, the defendant moved for a new trial, which the trial court denied following an evidentiary hearing.  This appeal followed.

II. Analysis

The defendant claims that his trial counsel (who is not counsel on appeal) provided constitutionally deficient representation under Part I, Article 15 of the New Hampshire Constitution and the Sixth Amendment to the United States Constitution. "The State and Federal Constitutions guarantee a criminal defendant reasonably competent assistance of counsel." State v. Eschenbrenner, 164 N.H. 532, 539 (2013); see N.H. CONST. pt. I, art. 15; U.S. CONST. amend. VI. "To demonstrate a violation of this right, the defendant must show that his trial counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Eschenbrenner, 164 N.H. at 539 (quotation omitted). "Because the standard for determining whether a defendant has received ineffective assistance of counsel is the same under both the State and Federal Constitutions, we will examine the constitutional competency of counsel's performance under the State Constitution, and rely upon federal case law only for guidance." State v. Kepple, 155 N.H. 267, 269 (2007).

"To prevail upon a claim of ineffective assistance of counsel, the defendant must demonstrate, first, that counsel's representation was constitutionally deficient and, second, that counsel's deficient performance actually prejudiced the outcome of the case." State v. Collins, 166 N.H. 210, 212 (2014). "Both the performance and prejudice prongs of the ineffectiveness inquiry are mixed questions of law and fact." Eschenbrenner, 164 N.H. at 540. "Therefore, we will not disturb the trial court's factual findings unless they are not supported by the evidence or are erroneous as a matter of law, and we review the ultimate determination of whether each prong is met de novo." Collins, 166 N.H. at 213. A failure to establish either prong requires a finding that counsel's performance was not constitutionally defective. Id. at 212.

To satisfy the first prong of the test, the performance prong, the defendant must show that counsel's representation fell below an objective standard of reasonableness. Id. To meet this prong of the test, the defendant must show that counsel made such egregious errors that he failed to function as the counsel the State Constitution guarantees. State v. Thompson, 161 N.H. 507, 529 (2011). We afford a high degree of deference to the strategic decisions of trial counsel, bearing in mind the limitless variety of strategic and tactical decisions that counsel must make. Id. "The defendant must overcome the presumption that trial counsel reasonably adopted his trial strategy." Id. "Accordingly, a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. (quotation omitted).

To satisfy the second prong, the defendant must demonstrate actual prejudice by showing that there is a reasonable probability that the result of the

3

proceeding would have been different had competent legal representation been provided. Eschenbrenner, 164 N.H. at 539. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." State v. Brown, 160 N.H. 408, 413 (2010) (quotation omitted). The prejudice analysis considers the totality of the evidence presented at trial. Kepple, 155 N.H. at 270.

## A. Counsel's Performance

On appeal, the defendant argues that his trial counsel's performance was constitutionally deficient in four respects: (1) failure to rebut the State's characterization of the defendant's statement to the police; (2) lack of preparation of the mother for her testimony; (3) introduction of evidence of a prior sexual assault committed against the child by another person without a reasonable strategy; and (4) failure to object to opinion testimony given by a child protective services (CPS) worker. Because we agree with the defendant with respect to claims (1) and (4), we find it unnecessary to examine claims (2) and (3).

### (1) Defendant's Statement to the Police

In its opening statement, the State asserted that when the investigating officer, Detective Stevens, interviewed the defendant concerning the allegations, the defendant commented that his father had faced similar allegations in the past. Specifically, the prosecutor described the conversation between the defendant and Stevens as follows:

> And the Defendant comes down to the police station, spends a total of four or five minutes before he ends the conversation and moves on. [Stevens is] going to tell you how the Defendant told him, "Yeah, my father was accused of this but he was found – he was – got away with it, so I'm going to fight it." That's the end of the conversation.

Stevens was the State's first witness. After describing briefly how he became involved in the case, Stevens began to explain the content of his interview with the defendant. With respect to the interview, Stevens testified that the defendant denied the allegations. However, the court sustained defense counsel's objection when Stevens attempted to read directly from the transcript of the interview. The State then elicited the following testimony after refreshing Stevens's memory with the transcript:

> Q: Okay. Now do you remember – what do you recall the Defendant stating about his father?
>
> A: He told me that his dad had been accused of sexual assault about ten years ago and he beat that.

4

Q: Okay. And as a result of that what did he say he was going to do?

A: That he was going to fight it in court.

Q: Altogether, you said it's a relatively short interview, how long did it last?

A: I could estimate five minutes.

Q: And did you end the interview or did he end the interview?

A: My recollection is that he did.

During cross-examination, defense counsel and Stevens had the following exchange:

Q: And he denies ever touching her, not once, not twice, but probably four or five times in the course of that interview—

A: Again—

Q: —has never touched her?

A: Again, I would say that – I testified that he denied it. I'm not going to sit here and tell you how many times because I don't remember.

Q: And in fact, he denies the allegations before ever mentioning anything about his dad?

A: Correct.

Q: And it didn't take you too long to realize during the course of this interview that Mr. Wilbur was going to stand on his denial and you weren't going to get any further information? Do you recall—

A: I—

Q: —putting that in your—

A: I would—

Q: —report?

A: I would agree with that.

At no point during the cross-examination of Stevens did defense counsel utilize the transcript of the interview, which she had access to during the trial.

During closing argument, defense counsel reminded the jury that the defendant denied the child's allegations during his interview with Stevens, explaining to the jurors that they "have at least that denial on the record so that you know that has happened." In its closing, the State responded as follows:

> Defendant, Defense attorney points out to you, he denied it. Yeah, he denied it for about four minutes, ended the interview, and said, "You know what, my father got away with this so I'm going to fight it in court." So here we are. That's not a real denial.

> And consider that, if you're accused of this, you're going to do this for three minutes and then leave, or are you going to explain your story? Defense attorney wanted to point out how he denied it. You consider if that's a real denial or that's a go down and, "I'm not saying anything," and going away.

Defense counsel did not object to this portion of the State's closing argument even though the State's characterization of the interview varied substantially from the actual contents of the interview.

The defendant advances two arguments in support of his position that his counsel's handling of the description of his interview with Stevens was constitutionally deficient. First, he complains that counsel did not utilize the transcript during cross-examination to establish, in response to Stevens's testimony, that Stevens did not remember how many times the defendant denied assaulting the child, and that the defendant denied the allegations at least a dozen times. Second, the defendant faults counsel for not challenging Stevens's testimony, or the State's opening and closing statements, in which the defendant was characterized as having said that his father "beat" or "got away with" a sexual assault and that he intended to do the same — assertions that the prosecutor argued did not amount to a "real denial" of guilt.

As the trial court recognized, "[t]he difference between what was actually said in the transcript of the interview by the defendant and how the same comments by the defendant were relayed to the jury by [Stevens] is stark." During the interview, in response to questioning, the defendant stated:

> Long, long time ago my dad had a case that was happening but it weren't true. He proved it. It weren't true. I went into the courts with him and doing the same thing I am now. I sat down and told him everything . . . but it got proved . . . [t]hat it didn't happen.

6

The defendant then went on to assert his innocence about a dozen times throughout the rest of the interrogation, and only stated that he would "fight it" in court in response to Stevens's statement that he "would likely end up being charged with a crime." Moreover, the defendant never indicated to Stevens that he was unwilling to answer further questions that the officer desired to ask.[1]

The defendant contends that "[n]o reasonably competent trial attorney would have permitted the State to assert that her client intended to 'beat' the charge, or 'get away' with it, when what he said is that he would prove his innocence." He argues that by failing to directly challenge these mischaracterizations, his counsel enabled the State to convey to the jury the misleading impression that the statements were implied admissions rather than fervent denials. While the trial court was troubled by the "undoubtedly misleading" impression left by the State's characterization of the defendant's statements, it ultimately ruled that defense counsel was not ineffective because she "at least succeed[ed] in eliciting on cross-examination that the Defendant professed his innocence . . . ." We do not agree with the trial court's assessment that counsel's performance was minimally adequate.

Stevens's testimony, and the prosecutor's argument, that the defendant told the detective that he, like his father, would "get away with" or "beat" the charges in court, effectively conveyed to the jury that the defendant was implying his guilt. See State v. Gomez, 172 P.3d 1140, 1145 (Idaho Ct. App. 2007) (explaining that the defendant's statement that "he would beat the charge and had done so before" was an "implicit admission"). This implication stands in stark contrast to the defendant's actual statements, which conveyed his consistent assertions of his innocence. But defense counsel, who was armed with the interview transcript at trial, did not object to this testimony, nor did she attempt to neutralize the characterization. Cf. State v. Cable, 168 N.H. 673, 687 (2016) (holding that trial counsel was not ineffective because "[t]he decision to neutralize the testimony rather than to object was a reasonable tactical choice" (quotation omitted)).

The mischaracterization of the substance of the defendant's statements to Stevens was compounded during the prosecutor's opening and closing arguments. As the trial court recognized, "[t]he State's choice of words," was "a calculated effort to mislead the jury." The State highlighted the potential use of this tactic during its opening, but defense counsel did virtually nothing to counteract or otherwise correct this misimpression during the course of trial. Instead, by failing to take any corrective course of action, counsel permitted the State to fabricate a misleading narrative to suggest that the defendant implicitly admitted guilt. Cf. State v. Vandebogart, 139 N.H. 145, 160 (1994)

---

[1] When Stevens proposed that the defendant take a lie detector test, the defendant responded that he would not do so until he talked to his lawyer. We do not suggest that defense counsel should have elicited this information at trial.

7

("A prosecutor may draw reasonable inferences from the facts proven, and has great latitude in closing argument to both summarize and discuss the evidence presented to the jury and to urge the jury to draw inferences of guilt from the evidence." (quotation omitted)); Zapata v. Vasquez, 788 F.3d 1106, 1115-16 (9th Cir. 2015) (holding that trial counsel was ineffective by failing to object to the prosecutor's "remarks" that were "fabricated from whole cloth").

The State is correct that defense counsel did present evidence that the defendant denied the charges. However, the evidence presented in this regard was far too little, given that counsel did not fully elicit the manner of the defendant's denial or the number of times that the defendant denied the charges, and, more importantly, permitted the State to effectively paint these denials as disingenuous. In practical effect, defense counsel permitted the State to convey to the jury that the defendant implicitly admitted to being guilty of committing the crimes charged. See Gomez, 172 P.3d at 1145; cf., e.g., Arizona v. Fulminante, 499 U.S. 279, 296 (1991) (noting that "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him" (quotation omitted)); State v. Anaya, 134 N.H. 346, 352 (1991) (noting that cases "in which the defendant's attorney tells the jury the defendant is guilty of the charged offense" tend to be viewed by reviewing courts "as warranting automatic reversal"); State v. Wiplinger, 343 N.W.2d 858, 860 (Minn. 1984) (explaining "the basic principle that a criminal defense attorney cannot admit his client's guilt to the jury without first obtaining the client's consent to this strategy"). This failure to rebut the State's mischaracterization was objectively unreasonable. See Collins, 166 N.H. at 213. Accordingly, we hold that defense counsel's representation was constitutionally deficient.

### (2) Failure to Object to Improper Expert Testimony

Next, the defendant argues that his counsel was deficient by failing to object to certain testimony of the CPS worker who interviewed the child. The CPS worker was the State's final witness. On direct examination, the CPS worker testified that:

> [The child] was sexually reactive, and she acted out on other children when she had an opportunity. She had a really hard time mentally just dealing with this. It had been going on for so long that she started to identify with the perpetrators, with the people who she alleged abused her. And those are typical of children that have been abused.

The trial court ruled, and the State does not dispute on appeal, that the CPS worker's testimony "appears to have crossed into the realm of expert testimony." Rather, the State advances the trial court's ultimate conclusion that "trial counsel could have made a reasonable tactical decision to not object

8

so as to avoid bringing further attention to" the comment. "We recognize that experienced trial counsel learn that objections to each potentially objectionable event could actually act to their party's detriment," and, therefore, "[l]earned counsel use objections in a tactical manner." Thompson, 161 N.H. at 529 (quotation omitted). Accordingly, "any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial to a client that failure to object essentially defaults the case to the state." Lundgren v. Mitchell, 440 F.3d 754, 774 (6th Cir. 2006).

Here, the CPS worker explained that the child's behavior resulted from conduct that "had been going on for so long." This statement directly associates the defendant with the child's behavior because the child had stated that the sexual assaults committed by the defendant occurred over a period of time. In contrast, the jury had already heard testimony that while the child had been sexually assaulted by a man other than the defendant, that assault only occurred once, years earlier. The CPS worker also explained that the child's behaviors were "typical of children that have been abused." This improperly implies that, in her opinion, the child was sexually abused. See State v. Cressey, 137 N.H. 402, 412 (1993) (holding that "expert testimony may not be offered to prove that a particular child has been sexually abused . . . ."). The CPS worker's testimony offered nothing to rebut or explain the defendant's claim that the child had fabricated the allegations or was otherwise untruthful. See State v. Chamberlain, 137 N.H. 414, 417-18 (1993) (noting that an expert may testify to "commonly observed behaviors includ[ing] the delayed reporting of abuse, inconsistent recountings of the abuse, and recantation of the initial disclosure" to rebut the inference that the victim is lying). Rather, "it is directly linked to a determination of the guilt or innocence of the defendant . . . ." State v. MacRae, 141 N.H. 106, 109 (1996) (quotation and citation omitted).

We reject the State's contention that the fact that the prosecutor did not follow up on the CPS worker's statement establishes that trial counsel "could have made a tactical decision to not object so as to avoid bringing further attention to the brief comment." During closing argument, the prosecutor explained to the jury that the CPS worker was "[s]pecially trained to do this." The prosecutor's comment attached the "aura of importance" typically associated with expert testimony. State v. Campbell, 127 N.H. 112, 116 (1985); cf. Cressey, 137 N.H. at 405 (explaining that expert "testimony involves the potential risks that a jury may disproportionately defer to the statements of an expert" and "may attach extra importance to an expert's opinion simply because it is given with the air of authority that commonly accompanies an expert's testimony"). This argument further reinforced the CPS worker's improper testimony. Yet counsel did not object at this point either. Because our case law is clear on this issue, we hold that defense counsel's failure "to object cannot reasonably have been said to have been part of a trial strategy or tactical choice." Collins, 166 N.H. at 214 (quotation omitted).

9

B. Prejudice

Having concluded that defense counsel's performance was constitutionally deficient, we must next decide whether the defendant was prejudiced as a result of these errors. The trial court explained that "even if the first prong [of Strickland] had been satisfied," the defendant failed to establish prejudice because the child's "testimony was powerful in that it was both detailed and graphic" and "there were only fleeting instances of inadmissible testimony and the evidence mischaracterized by the State regarding the interrogation had minimal inculpatory impact." The trial judge who decided the defendant's motion for new trial did not preside over the defendant's trial. The trial court did not, therefore, observe the child on the witness stand, and instead drew its conclusion from the trial transcript. Thus, we are in the same position as the trial court to assess the trial record. See Masse v. Commercial Union Ins. Co., 136 N.H. 628, 631-32 (1993) ("Because the trial judge decided the case on the record and therefore could not have observed the demeanor and credibility of the witnesses, the standard of review should be broadened." (quotation and brackets omitted)); Commonwealth v. Haley, 604 N.E.2d 682, 684 (Mass. 1992) ("When a motion judge has not presided at the trial, we defer only to the judge's assessment of the credibility of witnesses at the evidentiary hearing on the new trial motion, but we consider ourselves in as good a position as the motion judge to assess the trial record."). Based on our review of the record, we do not share the trial court's view that the child's testimony was sufficiently compelling as to render harmless the evidence and argument improperly placed before the jury as the result of defense counsel's deficient performance detailed above.

The State argues that the defendant cannot establish prejudice because he was acquitted on some of the charges. Other courts recognize that acquittal on certain charges may weigh against a finding of prejudice. E.g., Walker v. Martel, 709 F.3d 925, 930 (9th Cir. 2013) (upholding the state court's ruling that defendant was not prejudiced, in part, because the jury acquitted defendant on some of the charges); McGlothlin v. State, 791 S.E.2d 645, 649 (Ga. Ct. App. 2016) (holding that defendant was not prejudiced where the jury acquitted him of the most serious charge); Giles v. State, 675 P.2d 441, 442-43 (Okla. Crim. App. 1984) (rejecting defendant's ineffective assistance claim where he was acquitted of one charge). In those cases, however, the evidence of guilt "was robust." Walker, 709 F.3d at 943; Giles, 675 P.2d at 442 (noting the "overwhelming evidence of the [defendant's] guilt"). Here, as is the situation in many child sexual assault cases, the case turned on the child's credibility. See Collins, 166 N.H. at 214-15. "However, because of defense counsel's errors, that credibility was impermissibly bolstered," id. at 214, all while permitting the State to mischaracterize the defendant's statements as an implicit admission of guilt. The fact that the defendant was acquitted of the charges related to penile penetration shows that the State's case was, in part, rejected by the jury. Cf. Strickland v. Washington, 466 U.S. 668, 695 (1984)

("Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways."). We cannot say with confidence that the jury would not have rejected more, or perhaps all, of the charges had his counsel performed competently.

The State further asserts that the defendant cannot be prejudiced by defense counsel's failure to object to the prosecutor's closing because the jury was instructed that the opening and closing arguments are not evidence. The State is correct in its assertion that the jury is presumed to have followed the court's instructions. See State v. Cooper, 168 N.H. 161, 170-71 (2015). However, here the prosecutor's comments highlighted evidence that was erroneously admitted by virtue of defense counsel's deficient performance, which cut directly to the essential issue at trial — credibility. Cf. State v. Lake, 125 N.H. 820, 823-24 (1984) (reversing a conviction based on conclusion that error was not harmless where a prosecutor's "improper comment went directly to" credibility and "[i]t would be virtually impossible to determine the degree to which the jury may have been influenced by" it). We do not view the statements made during closing arguments in isolation. Rather, the closing arguments simply served as the mechanism by which the State highlighted prejudicial evidence that was improperly allowed to be admitted due to defense counsel's constitutionally deficient performance. We therefore cannot conclude that the jury instructions in this case remedied this prejudice.

In sum, the cumulative impact of defense counsel's errors is such that the defendant was prejudiced in this instance. See Dugas v. Coplan, 428 F.3d 317, 335 (1st Cir. 2005) (looking to the cumulative impact of counsel's errors in determining prejudice); United States v. Munoz, 605 F.3d 359, 377 (6th Cir. 2010) ("When determining prejudice, a court must consider the errors of counsel in total, against the totality of the evidence in the case." (quotation and bracket omitted)). Defense counsel's errors permitted the State to argue that the defendant impliedly confessed to the crime, while contemporaneously allowing the State to bolster the child's credibility through the testimony of the CPS worker. Given that the child's credibility was a central issue in the case, Collins, 166 N.H. at 214-15, we conclude that there is a reasonable probability that the result of the proceeding would have been different had competent legal representation been provided, Eschenbrenner, 164 N.H. at 539. The defendant, therefore, is entitled to a new trial. Because the defendant prevails under the State Constitution, we do not address his federal claim. Collins, 166 N.H. at 215.

Reversed and remanded.

HICKS, BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.